# United States District Court
## Western District of Virginia
### Harrisonburg Division

_____
                       )

**ROGER L. WOODS**,           )           Civil No.: 5:11cv00131
            *Plaintiff,*    )

**v.**                      )
                       )

**TIMOTHY J. HEAPHY**,    )         **REPORT AND**
United States Attorney       )    **RECOMMENDATION**
                       )

**MICHAEL J. ASTRUE**,    )

**PAUL CLEMENT**        )
                       )    By:  Hon. James G. Welsh
          *Defendants*    )        U. S. Magistrate Judge
_____ )

Appearing *pro se*, Roger Woods ("the plaintiff" or "Woods") brings this civil action challenging a final decision of the Commissioner of the Social Security Administration ("the agency") denying his applications for a period of disability and disability insurance benefits ("DIB") and for Supplemental Security Income ("SSI") [1] under Titles II and XVI respectively of the Social Security Act, as amended ("the Act"), 42 U.S.C. §§ 416 and 423 and 42 U.S.C. §§ 1381 *et seq*., respectively. [2]   Jurisdiction of the court is pursuant to 42 U.S.C. § 405(g).

---

[1]   The plaintiff's period of eligibility for SSI extends through the date of the ALJ's December 15, 2010 decision.

[2]   In his complaint, the plaintiff also names United States Attorney Timothy J. Heaphy and former United States Solicitor General Paul Clement. Only the Commissioner is a proper defendant in an action seeking judicial review of a disability benefits or SSI decision under 42 U.S.C. § 405(g).  Accordingly, these defendants should be dismissed with prejudice on the basis of a failure by the plaintiff to state a claim upon which relief can be granted.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii); Fed. R. Civ. P. 12(b)(6).

The record shows that Woods protectively filed his claims on April 30, 2009. (R.10)  In each application, he asserts that he became disabled as of December 15, 2008. (R.112-118,119-125)  Both claims were denied initially, on reconsideration, and for a third time by written decision issued December 15, 2010 following a hearing before an administrative law judge ("ALJ"). (R.7-21,48-53,57-63,64-70)  With the Appeals Council's subsequent denial of the plaintiff's request for review (R.1-5), the unfavorable ALJ decision now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981.

Along with his Answer to the plaintiff's Complaint, the Commissioner has filed a certified copy of the Administrative Record ("R."), which includes the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision.  By standing order this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). On August 14, 2012, Woods filed sixty-five pages of "Additional Evidence" with the court. (Dkt. # 11)  The commissioner filed a motion for summary judgment along with a brief in support of that motion on December 18, 2012. (Dkt. # 12, 13)  Woods responded on January 22, 2013 with a written statement asserting that he is disabled, along with four more pages of purported new evidence. (Dkt. # 15)  No request was made for oral argument.

I.      SUMMARY AND RECOMMENDATION

In his complaint, Woods does not identify any particular objections to the Commissioner's decision. Instead, he asserts that he is unable to work because of lumbar degenerative joint disease and hypertension as well as side effects from his medication, and he

asks the court to grant him both DIB and SSI.  Because Woods is unrepresented and has not identified any specific claim of error by the ALJ, the undersigned has conducted an independent review of the record to determine whether the Commissioner's decision denying benefits is supported by substantial evidence or whether remand is required based on new and material evidence.  For the reasons that follow, the undersigned concludes that Commissioner's decision is not supported by substantial evidence, and accordingly **RECOMMENDS** that the Commissioner's motion for summary judgment be **DENIED**, that the Commissioner's final decision be reversed, that this matter be **REMANDED** to the agency for further proceedings consistent with this report and recommendation **pursuant to sentence 4 of 42 U.S.C. § 405(g)**, and that this case be **STRICKEN** from the active docket of the court.

## II.     STANDARD OF REVIEW

The court's review in this case is limited to determining whether the factual findings of the Commissioner are supported by substantial evidence and whether they were reached through application of the correct legal standards.  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).  The court is "not at liberty to re-weigh the evidence

. . . or substitute [its] judgment for that of the [ALJ]." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (internal quotation marks omitted).


## III.    EVIDENCE SUMMARY


### Work History and Vocational Profile

For some 23 years before he was injured stepping out of his truck in 2008, Woods drove a tractor trailer for a living. (R.28,36-38,132,169-170)  This work is classified by the Department of Labor as exertionally medium and semiskilled as generally performed.  (R.15,38)  Because he was frequently required manually to load and unload objects as heavy as 100 lbs, as performed the plaintiff's job was exertionally heavy.  (R.15,38,132,170)  Having attended school only through the seventh grade, Woods educational level is classified as limited.  (R.28)


### Medical History

Woods history of degenerative disc disease dates at least from 2007. (R.131,296,311) [3] On June 19 of that year, he sought medical attention for pain in his left hip and buttocks that he attributed to taking a wrong step off of his truck.  (R.313)  An MRI study done during the following week demonstrated a moderate size, left posterior disc herniation between the fourth and fifth lumbar vertebrae, along with some compression of the L5 nerve root.  (R.14,279,296)  His disc disease was treated with a series of steroidal injections. (R. 288)  Although he reported a reoccurrence of back pain along with an attendant left lower extremity radiculopathy in January

___

[3]   One of the documents Woods filed with the court as "Additional Evidence" is a May 26, 2006 CT scan report from the Department of Radiology at Augusta Medical Center indicating a disc bulge and stenosis between the fourth and fifth lumbar vertebrae, with possible nerve root compression.  (Dkt. #11-1 at 5)

2008, Woods continued working full time until he aggravated his back condition by making another wrong step off his truck on November 18, 2008. (R.281-282)

Sometime in January 2009, Woods further aggravated his back condition while dancing. (R.28,281) At that time, he complained to his primary care physician about worsening pain in his lower back radiating to his left foot, which was "making it … very difficult in terms of work." (R.288,290). His physician, Kirsta Craig, M.D., initially prescribed hydrocodone with acetaminophen, which did not provide satisfactory relief. (R.288,290) A follow-up examination on April 28, 2009 demonstrated the plaintiff's limited range of motion and diminished Achilles reflex, as well as positive straight left leg raising (R.14,286), and an MRI on June 18, 2009 demonstrated further degenerative changes between several vertebrae, including a left paracentral disc protrusion at L4/L5 producing moderate canal stenosis, severe left lateral recess stenosis, and moderate left neural foraminal stenosis. (R.392) When an epidural steroid injection did not provide satisfactory relief, Woods underwent surgery in September 2009. (R.14, 371-72,376-77).

Unfortunately, surgery and follow-up physical therapy led only to "minimal overall improvement" in the plaintiff's symptoms. (R.257,398-420,424-25) As a result, when Woods saw his orthopedist, Gregory Helm, M.D., in late November he reported that his left-sided pain had only "improved somewhat" and that he was now feeling pain on his right side. (R.445) Although a post-surgery MRI demonstrated diminished lateral stenosis at L4/L5 (R.444,448-49), in March 2010 Woods reported to his doctor that he was experiencing on-going back pain and his range of motion was significantly limited. (R.455) On examination he was able to flex to 45

degrees, extend to 4 degrees, and laterally flex 10 degrees right and 15 degrees left. (*Id.*)  His deep tendon reflexes were 2+, except for his left Achilles, which was 1+; his strength, however, remained 5/5 bilaterally.  (R.455)   Consistent with these findings, Dr. Craig observed at that time that "[i]t appears, from patient reports, that [Woods] is disabled."

### The Impact of Woods's Condition on his Daily and Work Activities

At the hearing, Woods testified that his back pain continues to bother him, and he was continuing to have bilateral pain in both lower extremities.  (R.29).  He described the pain as varying from day to day and to affect him whenever he bends-over, sits, or walks.  (R.29,30)  In his earlier function reports submitted to the agency, Woods similarly reported that his back pain limited his ability to lift, squat, bend, stand, reach, walk, sit, kneel, or climb stairs.  (R.177,185, 218)  He reported an ability to walk only about 100 feet before needing to rest and that he used a walker or cane to help him ambulate.  (R.218-19).  He reported that he is able to lift a maximum of 25 to 35 pounds before experiencing pain (R.32), and he estimated that he could sit for stretches of no longer than 15 to 20 minutes and stand for stretches of no longer than 20 to 30 minutes (R.31).

Woods described his back pain and attendant radiculopathy has hampered his daily activities; however, he remains able to live alone and care for himself.  (R.120,213,216)  For a time, his daughter did household chores and laundry for him (R.182), but he has since resumed doing these for himself, although not as quickly as before.  (R.215,235,247)  He remains able to drive, shop for himself and do his own cooking.  (R.33,182,215-216,235,247).  Since injuring his back, he has been pharmacologically treated with hydrocodone with acetaminophen, which

causes him to experience drowsiness at least from time to time. (R.276-77; *see* R.136,178,183, 224,260)  Asked at the hearing about his ability to perform full time work activity that required no lifting, bending, or walking and permitted him to sit or stand as he wished, the plaintiff indicated that he probably could do a job, such as a cafeteria cashier, provided he could learn how to operate a cash register, provided the job required no lifting, bending or walking, and provided he was permitted to sit or stand as he wished. (R.32)

## Functional Capacity Test

On January 20-21, 2010, the plaintiff underwent a two-day functional capacity assessment at Augusta Medical Center ("AMC").  (R.426-434)  He performed significantly better on the first day than he did on the second and the examiner indicated in the test report that this could indicate an inability to sustain a level of work on a daily basis.  (R.428,430)  It was noted that the plaintiff complained of back discomfort throughout the testing and that his complaints of back discomfort increased on the second day of testing.  (*Id*.)  During testing, Woods also exhibited limited squatting tolerance and limited trunk rotation (R.430,432–433); he tolerated sitting activities and static standing for more than 20 minutes (R.430), and the examiner concluded that Woods could tolerate work that required him to sit or stand between one-third and two-thirds of the work day, but he could not tolerate work that required him to walk for more than five percent of the work day (R.431).

## Vocational Expert Testimony

Vocational testimony at the hearing was provided by Ashley Wells. (R.35-44)  She testified that Woods's past relevant work as a truck driver is listed in the Dictionary of

Occupational Titles ("DOT") as medium in exertion and semiskilled; however, as performed by the plaintiff , this work was exertionally heavy. (R.38) During the hearing, the ALJ posited three hypothetical questions, and asked the witness whether such hypothetical individuals could find work in the national economy. First, he asked her to consider an individual of the same age, educational background, and vocational history as Woods with the retained capacity to perform the full range of light work as indicated by the state agency medical reviewer. (R.230–241) In her response, this witness opined that such an individual could not perform Woods' past relevant work, but he could make an adjustment to other work, and she stated that such an individual could work as a brake adjuster, (642,000 positions nationally and 21,000 in Virginia), escort vehicle driver (942,000 positions nationally and 27,000 in Virginia), and parking lot attendant (132,000 positions nationally and 3,000 in Virginia). (R.38-39)

Asked next to assume a hypothetical claimant with the same vocational profile as the plaintiff and with the limitations identified in the AMC functional capacity assessment (R. 39), Ms. Wells testified that, the tolerances listed for specific activities in the functional capacity evaluation were consistent with an individual able to perform sedentary work [4] with a sit/stand option [5] (R. 39-40); she cited work as a cafeteria attendant, thread separator and almond

---

[4] "**Sedentary work**" is defined in [*5] 20 C.F.R. § 404.1567(a) to involve lifting no more than 10 pounds at a time and occasionally carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of standing and walking is often required in carrying-out job duties, and jobs are classified as sedentary if walking and standing are required occasionally and other sedentary criteria are met.

[5] The opportunity to change positions during the performance of work activity is typically described as the "sit/stand option" or "sit/stand limitation." *See Gibson v. Heckler*, 762 F.2d 1516, 1518 (11th Cir. 1985).

blancher as jobs such an individual could perform, and to demonstrate their availability in the national economy she testified that there are 384,000 cafeteria attendant positions nationally and 88,000 in Virginia, that there are 539,000 thread separator positions nationally and 9,000 in Virginia), and that there are also 539,000 almond blancher positions nationally and 9,000 in Virginia).  (R.40-41)

As a third hypothetical question, the ALJ asked Wells to consider the same individual, but with the additional limitation of pain that required unscheduled or unpredictable breaks and interfered with his ability to concentrate and perform his tasks, and in response Ms. Wells opined that such an individual would not be able to do any work that existed in significant numbers in the national economy. (R.41)

Neither the ALJ nor the plaintiff's attorney questioned this vocational witness about her methodology.  Neither the ALJ nor the plaintiff's attorney questioned the accuracy of any of her numbers, and neither of them asked her to identify where she got them.

**Medical Opinions**

The record in this case reflects a mix of medical opinions concerning the plaintiff's residual functional capacity.  Based solely on reviews of an incomplete medical record, both of the state agency medical reviews opined that the plaintiff was not disabled, and remained able to perform work at a light exertional level. (R.194-195,203-204,239-240,251-252)  Dr. Matthew Pollard, who last saw Woods in March 2009, noted on that occasion that he did not understand why Woods was not working and that he had encouraged Woods to find a work. (R.281)  In

contrast, seven months later the plaintiff's orthopedist, Dr. Gregory Helm, indicated in his October 20, 2009 office note that he "ha[d] given [Woods] off of work from one more month" and that "[h]opefully he can return to work after that." (R. 477) Based on her longitudinal record of treating the plaintiff, his primary physician, Dr. Kirsta Craig, concluded he is disabled and had been so disabled since January 18, 2009. (R.459) In addition the record contains a handwritten note from Dr. Robert Kennedy, dated March 30, 2011, stating that Woods "is still unable to do work due to his back" and that he "will be unable to do work indefinitely." (R.492)

IV.     DISCUSSION

A.

In this case the plaintiff submitted a significant number of documents to this court, which he has identified as "additional evidence." For that reason, an initial assessment of these records is necessary to determine whether a remand is warranted under sentence six of 42 U.S.C. § 405(g). [6] On review, much of Woods's "additional evidence" is neither new nor material.

---

[6] In relevant part, sentence six provides that "[t]he court … may at any time order additional evidence to be taken before the [Commissioner], but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Evidence is not new within the meaning of this section if it is duplicative or cumulative. *Wilkins v. Secretary, Dep't of Health and Human Services*, 953 F.2d 93, 96 (4th Cir. 1991). "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Id.*

In large measure, this "additional evidence" consists of redacted photocopies of documents already in the record. [7] And almost all of the remainder are duplicative and cumulative of the evidence that is before the agency. [8] One of the few items that is new is an AMC radiology report of a May 2006 CT scan revealing some new information about the longitudinal of the plaintiff's back condition; however it provides nothing new concerning its severity. (Dkt. #11-1 at 5) Thus, it suggests no factual basis upon which to conclude that the ALJ's decision would be different had he seen this report. The last two pages of Woods's exhibit identified as AMC "Discharge Instructions from Bob Lianez, N.P." similarly suggest no basis for a different decisional outcome. (Dkt. # 11-1 at 64-65). They show that Woods visited the emergency room in early July 2011 for an "acute exacerbation" of his back pain. This evidence, however, describes an event that took place seven months after the ALJ's decision and provides no basis in fact to question the ALJ's decision. *Szubak v. Sec'y of Health & Human Services*, 745 F.2d 831, 833 (3rd Cir. 1984); *Bradley v. Bowen*, 809 F.2d 1054, 1058 (5th Cir. 1987); *Sizemore v. Sec'y of Health & Human Services*, 865 F.2d 709, 712 (6th Cir. 1988); *Godsey v. Bowen*, 832 F.2d 443, 444-445 (7th Cir. 1987); *Jones v. Callahan*, 122 F.3d 1148,

---

[7] These include the following: a copy of his residual functional capacity assessment (Dkt. # 11 at 23-29; *see also* R. 426-434); several pages of medical records from University of Virginia Health Systems contained in exhibit 6F (Dkt # 11 at 41-63; *see also* R. 346–93); four pages of medical records from the Department of Neurological Surgery at UVA (Dkt. # 11-1 at 30–33; *see also* R. 443–45); the radiology report from his 2007 MRI (Dkt # 11-1 at 6–7; *see also* R. 279–80); five pages of medical records from North Augusta Family Practice (Dkt # 11-1 at 13–15, 16, 20; *see also* R. 286, 288, 290, 455, 457); two physical therapy reports; (Dkt. #11-1 at 8–10, 17–18; *see also* R. 401, 404–05; 424–25); and an Emergency Department Dictation Report from Augusta Medical Center (Dkt. # 11-1 at 11–12; *see also* R. 295, 298). The exhibit also contains a note from Dr. Robert Kennedy stating that Woods is disabled, which was presented to the Appeals Council but not the ALJ. (Dkt. # 11-1 at 2; *see also* R. 492).

[8] In particular, Woods's provided an updated list of prescriptions indicating that he still takes Vicodin (Dkt. # 34–37), three pages of medical records from physical therapy that add nothing to the reports already in the record (Dkt. # 38–40), two pages of medical records from Dr. Kirsta Craig at North Augusta Family practice that demonstrate that Woods has chronic back pain that, according to Woods, limits his mobility and ability to work (Dkt. # 19, 21, 22), two letters from Dr. Craig stating her opinion that he "has been unable to work since January 18, 2009" because of medical problems and would not be able to work for all of 2010. (Dkt # 11-1 at 3–4), and two handwritten notes from new doctors, both written after the ALJ's decision, expressing opinions that Woods was disabled. (Dkt. # 1 at 1–2).

1154 (8th Cir. 1997); *Ward v. Schweiker*, 686 F.2d d 762, 765-766 (9th Cir. 1982); *Rhodes v. Barnhart*, 117 Fed. Appx. 622, 625-626 (10th Cir. 2004); *Tirado v. Bowen*, 705 F.Supp. 179, 182 (SDNY. 1989); *Rawls v. Apfel*, 998 F.Supp. 70, 76 (DMass. 1998); *Lawrence v. Barnhart*, 2006 U.S. Dist. LEXIS 68201, *5 (WDVa. Sep. 20, 2006), 113 Soc. Sec. Rep. Serv. 548. Although post-decision medical evidence may in some circumstances be probative of a claimant's pre-decision condition, there is no reasonable probability in the instant case that a post-hearing report submitted by the plaintiff would affect the ALJ's finding that Woods was not disabled as of the date of his decision. Accordingly, Woods's evidence is neither new nor material, and for that reason, he is entitled neither to have the Commissioner's final decision vacated nor to a sentence six remand. [9]

## B.

Without serious question, if the ALJ could properly rely on the vocational testimony in this case, his decision would be supported by substantial evidence. His finding that Woods's condition fell short of listing severity is appropriately based on the absence of motor loss and Woods' ability to walk effectively, and ostensibly his non-disability determination is supported by substantial evidence, including the AMC assessment of Woods' residual functional capacity and by Woods own statements about his functional abilities and the scope of his daily activities.

---

[9] In his response to the commissioner's summary judgment motion, Woods included yet more documents: a summary of an occupational accident insurance claim (Dkt. # 15 at 3), a black-and-white photograph of what is presumably his truck (Dkt. # 15 at 4), a heavily redacted document entitled "Summary of Insurance" which lists "Disabled" for Woods's occupation (Dkt. # 15 at 5), and a photocopy of the front and back of his Virginia permanent disabled parking permit (Dkt. # 16 at 6–7). None of this belatedly-offered evidence warrants remand, either. The insurance claim summary hurts Woods's case more than it helps, as it indicates that Woods's doctor cleared him to return to work on November 2, 2007. The picture of the truck is not material, and neither the "Summary of Insurance" nor the disability placard "adds [anything] to a finding of disability here because there is no evidence that [either] ha[s] substantially similar requirements [to the Social Security Act] for finding a person to be disabled." *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

(*See* R.13,33,120,213-219,426-434).  The ALJ's evaluation of Woods's residual functional capacity properly weighed and considered the relevant evidence, including Woods's testimony and the various medical opinions.  (R.13-15)  His conclusion—that Woods retained the functional capacity to perform sedentary work with a sit/stand option—reflects both a reasoned and reasonable interpretation of that evidence.  (*See* R.15)  Given Woods' specific limitations, the ALJ also appropriately declined to apply the Medical-Vocational Guidelines, [10] which would have otherwise directed a non-disability finding.  (R.16)  Moreover, his hypotheticals fairly incorporated Woods' impairments and the relevant medical evidence.  *See Walker v. Bowen*, 889 F.2d 47, 50 (1989).

In other words, as long as the ALJ could reasonably rely on the answers of the vocational witness, the ALJ's conclusion that Woods could adjust to work in the national economy would be supported by substantial evidence.  That determination in the instant case, however, is subject to serious question, because of the ALJ's blind acceptance and complete decisional reliance on vocational testimony that was patently incredible as a matter of law.

## C.

Although deference to a fact finder's assessments of credibility is generally the rule both in judicial and administrative proceedings, the rule is not an absolute.  *See, e.g.*, *Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 575 (1985); *NLRB. v. Walton Mfg. Co.*, 369 U.S. 404, 417-418 (1962).  A fact finder is not entitled to credit testimony that is "incredible as a matter of law." *United States v. Rivera*, 775 F.2d 1559, 1561 (11th Cir. 1985).  This exception, however, is "stringent" and is satisfied only when the testimony is "unbelievable on its face," in that it

---

[10] 20 CFR Part 404, Subpart P, Appendix 2.

contains "facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature." *Id.* (quoting *United States v. Cravero*, 530 F.2d 666, 670 (5th Cir. 1976) (alterations in original); *see also United States v. Williams*, 49 Fed. Appx. 420, 424 (4th Cir. 2002). In other words, to be "incredible as a matter of law," the testimony must be more than merely implausible; it must be impossible, and if it is "incredible as a matter of law," an agency cannot rely on it in denying a claim. *Donahue v. Barnhart*, 279 F.3$^d$ 441, 446 (7th Cir. 2002) ("Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth."); *Geigy Chem. Corp. v. Allen*, 224 F.2$^d$ 110, 114 n.5 (5th Cir. 1955) ("Evidence which is inherently unbelievable is … no evidence" at all) (internal quotations omitted). Therefore, if the ALJ in the instant case relied on unreliable and absurd vocational expert testimony in finding that the claimant can perform other work that exists in significant numbers in the national economy, that finding is not supported by substantial evidence and must be vacated. *See Lancaster v. Comm'r of Social Security*, 228 Fed. Appx. 563, 575 (6th Cir. 2007) ("vocational expert's testimony was unreliable").

In the instant case, the vocational witness so grossly overestimated the number of positions available for **almond blanchers** and **thread separators**, both in the state and the national economy, as to render her testimony on that matter unbelievable on its face. No ALJ or other fact finder could reasonably believe that there are anywhere close to one-half a million hand almond blanchers or thread separators in the United States or anywhere close to 9,000 almond blanchers or thread separators working in Virginia. Moreover, these estimates are flatly

contradicted in the extreme by government-published statistics that are administratively noticeable under the agency regulations.

A hand almond blancher "observes blanched (skinned) almonds on conveyor belt emerging from blanching machine and removes almonds with skins missed by the machine" by rubbing or squeezing them between his or her fingers. DOT § 527.687-010. A thread separator, also referred to as a "thread drawer," "separates webs of lace into smaller pieces" to prepare them to be wound onto cards, "cuts [the] ends of [the] web[s] even with scissors," "[c]ounts out [the] prescribed number of sections (bands), pulls [the] thread to separate [the] lace between sections, and folds sections." DOT § 789.687-174.

The titles for these two jobs are among some 553 in the DOT that fall under Standard Occupational Code ("SOC") 51-9198: "Helpers—Production Workers." [11] According to the Bureau of Labor Statistics (BLS) May 2011 estimates of occupational employment, [12] there were 420,910 production helpers in the United States and 8,820 in Virginia. This means that the average DOT Title falling under the production helpers SOC classification would have 761 jobs

[11]   The Labor Department's Bureau of Labor Statistics does not gather employment data by DOT title—indeed, the Department no longer uses the DOT at all. The BLS does classify and count jobs according to the Standard Occupational Code (SOC). The association between DOT titles and SOC classifications can be ascertained by referring to "crosswalks." Department of Education, Crosswalk of DOT codes to SOC codes available at www.ed.gov/rschstat/eval/rehab/support/doc-soc.xls (last visited January 21, 2013).

[12]   U.S. Dep't of Labor, Bureau of Labor Statistics, *May 2011 National Occupational Employment and Wage Estimates: United States*, available at http://www.bls.gov/oes/2011/may/oes_nat.htm (last visited January 21, 2013); U.S. Dep't of Labor, Bureau of Labor Statistics, *May 2011 State Occupational Employment and Wage Estimates: Virginia*, available at http://www.bls.gov/oes/2011/may/oes_va.htm (last visited January 21, 2013)

nationally and only 16 in Virginia. Stated differently, the estimates given by the vocational witness ("VE") either for almond blancher or thread separator jobs alone exceeded the BLS's count of jobs in all 553 production helper professions combined, [13] and these rate starkly different from the BLS estimates which are administratively noticeable under the agency's regulations. [14] *See* 20 C.F.R. § 404.1566(d) ("When we determine that unskilled, sedentary, light, and medium jobs exist in the national economy … we will take administrative notice of reliable job information available from various governmental and other publications.").

Similarly, in its 2010 Occupational Outlook Handbook, the BLS estimate of the number of jobs in all food processing occupations is 311,300, a number that is less than 60% of the VE's estimate of almond blancher jobs alone. *Occupational Outlook Handbook*, Food Processing Occupations, U.S. Dep't of Labor, Bureau of Labor Statistics (2012-13 ed.) (available at http://www.bls.gov/ooh/production/food-processing-occupations.htm) (last visited January 25, 2013). [15]

---

[13] The VE's estimates for other occupations reveal similar flaws. For example, the VE testified that escort vehicle drivers numbered 942,000 nationally and 27,000 in Virginia, but BLS statistics indicate that "light truck or delivery services drivers" (SOC 53-3033) numbered 771,210 nationally and 18,650 in Virginia. That occupational classification contains six DOT titles, including Light Truck Drivers (DOT 906.683-022)—a catchall title that includes mail truck drivers—as well as passenger van and shuttle bus drivers (DOT 913.663-018). Likewise, the VE pegged the number of brake adjusters at 642,000 nationally and 21,000 in Virginia; by contrast, the BLS counts 589,000 "automotive service technicians and mechanics" of all kinds (SOC 49-3023) in the United States and 19,010 in Virginia.

[14] BLS estimates are also judicially noticeable under Fed. R. Evid. 201(b)(2), as they fall within the ambit of "sources whose accuracy cannot reasonably be questioned."

[15] SSA regulations explicitly state that the agency "will take notice of … [the] Occupational Outlook Handbook, published by the Bureau of Labor Statistics." 20 C.F.R. § 404.1566(d)(5).

The VE's estimate of the number of almond blancher jobs similarly far exceeds those of vocational experts in other disability cases. A search of Westlaw ALLCASES database for "almond blancher" returned thirteen results, all United States district court decisions, and not surprisingly eight come from the Eastern District of California—which covers the almond-growing region of the Central Valley. In one of the other four, the judge mentioned the DOT listing for "almond blancher (hand)" largely for the sake of ridiculing it. [16] VE estimates of the number of hand almond blanchers in other cases range on the low end from 200 in California and 800 nationally to 6,650 in California on the high end. [17]

The same database returned only two results for "thread separator"—one of which involved the same VE that testified in this case—and one result for "thread drawer."[18] Neither of these opinions notes the VE's estimate of thread separators.

If one reasonably assumes that the number of almond blanchers nationally is between 1,500 and 1,800 (the two middle estimates in cases in the database), then the VE's estimate in Woods' case exceeds the actual number by a factor of roughly 300, a factor that renders the vocational witness' testimony absurd in the extreme. It makes her estimate akin to confusing a tablespoon for a gallon or confusing a packed courtroom in Harrisonburg for a sellout crowd at

[16] *Banushi v. Barnhart*, 2007 WL 1858658, at 3 n.3, 4 n.4 (D. Mass. 2007).

[17] *Gutierrez v. Astrue*, 2012 WL 259141, at *2 (E.D. Cal. 2012) (1,000 in California, 1,500 nationally); *Schreier v. Astrue*, 2009 WL 4757242, at *3 (D. Nev. 2009) (1,800 nationally); *Underwood v. Astrue*, 2009 WL 498254, at *2 (E.D. Cal. 2009) (200 in California, 800 nationally); *Leach v. Astrue*, 2010 WL 2650696, at *3 (E.D. Cal. 2010) (6,650 in California). *See also Wilson v. Astrue*, 2012 WL 3862359, at *5 (E.D. Cal. 2012) ("The VE explained there were about 200 different job titles at the sedentary level; 4,300 jobs at the light level; 2,000 jobs at the medium level; and 1,000 to 2,200 jobs at the heavy level. *Id.* at 29–30. As specific examples, the VE identified the positions of almond blancher, flumer/potato washer, vegetable harvester, and icer.").

[18] *See Melvin v. Astrue*, 2012 WL 447617 at *4 (E.D.N.C. 2012); *Maupin v. Astrue*, 2012 WL 1970123 at *1 (W.D. Va. 2012); *Lopez v. Astrue*, 2011 WL 302853 at *1 (E.D. Cal. 2011).

Nationals Park. [19]   Irrespective of the obvious fact that almonds neither grow nor are they *blanched* in Virginia, the testimonial error by Ms. Wells is so egregious in the extreme and so contrary to common knowledge that the ALJ could not have reasonably relied on it.

For the sake of argument, even if one ignores this absurd testimony about the abundance of almond blanchers and thread separators in Virginia and nationwide, it can be cogently argued that the ALJ's decision should nevertheless be upheld on the basis of testimony on the availability of jobs for cafeteria attendants, which the VE estimated at 384,000 nationally and 88,000 in Virginia.  There are, however, two fundamental flaws in this argument.  First, the court cannot ignore the VE's gross overestimates of other jobs; that testimony alone seriously undermines her credibility.   And second, the VE's estimates of cafeteria attendant jobs raise questions of their own.  If her estimates are anywhere near correct, then more than one out of every 100 Virginians is a cafeteria attendant, [20]   and more than one out of every five American cafeteria attendants works in Virginia.   Thus, the VE's testimony regarding the number of cafeteria attendant positions is also incredible and provides no substantial evidence basis for court affirmation.

---

[19]   The main courtroom in Harrisonburg seats roughly 100–200 spectators; Nationals Park, the home of the Major League Baseball's Washington Nationals, seats 41,546. Nationals Park Information – Facts and Figures, available at http://washington.nationals.mlb.com/was/ballpark/information/index.jsp?content=facts_figures (last accessed February 11, 2013).

[20]   According to U.S. Census Bureau estimates, Virginia's population as of July 1, 2011 was approximately 8,104,384. U.S. Census Bureau, Population Division, *Table 1: Annual Estimates of the Population for the United States, Regions, States, and Puerto Rico: April 1, 2010 to July 1, 2012* (NST-EST2012-01), available at http://www.census.gov/popest/data/state/totals/2012/index.html (last accessed January 21, 2013).

While it is obvious, at least to anyone who pauses to think about it, that there are nowhere close 539,000 hand almond blanchers or thread separators working in the United States, it not so obvious that there are an insignificant number of unskilled sedentary jobs offering a sit/stand option. **Therefore, the** appropriate remedy herein is to reverse the Commissioner's final decision and remand the case to the agency for further consideration consistent with this report and recommendation.

## V.    PROPOSED FINDINGS

As supplemented by the above summary and analysis and on the basis of a careful and thorough examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1.    Timothy J. Heaphy (United States Attorney) and Paul Clement (former United States Solicitor General) are not proper party defendants in this action seeking judicial review of a Social Security Administration denial of claim for DIB and SSI under 42 U.S.C. § 405(g), and both should be dismissed with prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and F. R. Civ. P. 12(b)(6), on the basis of a failure to state a claim upon which it relief can be granted;

2.    Woods's new evidence is not "new and material," and thus remand for consideration of that evidence is not unwarranted;

3.    The ALJ's determination that Woods's impairments were not of listing-level severity is supported by substantial evidence;

4.    The ALJ's determination that Woods retained the residual functional capacity to perform sedentary work with a sit-stand option is supported by substantial evidence;

5.      The vocational witness's testimony regarding the number of hand almond blancher and thread separator positions both nationally and in Virginia is incredible as a matter of law, and the ALJ's reliance on this testimony constitutes reversible error;

6.      This incredible vocational testimony, together with the attendant dubious estimate of the number of cafeteria attendant jobs in Virginia, so undermined the reliability of the vocational witness that the ALJ's reliance on her testimony regarding cafeteria attendant positions constitutes reversible error;

7.      The ALJ's finding that the plaintiff could make an adjustment to work available in the national economy is not supported by substantial evidence; and

8.      Remand pursuant to sentence four of 42 U.S.C. 405(g) is warranted for the reason that the ALJ relied on vocational testimony that is incredible as a matter of law.

## VI.      INTRUCTIONS TO THE CLERK

The clerk is directed to transmit the record in this case immediately to the presiding United States district judge and to transmit a copy of this Report and Recommendation to all counsel of record and unrepresented parties.

## VII.      NOTICE TO THE PARTIES

Both sides are reminded that pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the

conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

DATED: This 7th day of March 2013.

s/ *James G. Welsh*

United States Magistrate Judge